# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

Unsealed 8/12/08

In the Matter of the Search of

ORDERED SEALED BY COURT

2952 40th Street,
San Diego, California 92105.

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER: '08 MJ 8425

I, Ronald T. Ribail, being duly sworn, depose and say:

I am a Special Agent with FBI, and have reason to believe that on the property or premises known as:

**2952 40th Street, San Diego, California 92105.**

[as more fully described in ATTACHMENT A]

in the Southern District of California there is now concealed a certain person or property, namely:

*SEE ATTACHMENT B*

which is:
(1) property that constitutes evidence of the commission of a criminal offense; and
(2) property designed and intended for use or which is or has been used as a means of committing a criminal offense;

concerning a violation of Title 18, U.S.C., Section 842(a)(2) and (i)(1) and 1028 (a)(7)
The facts to support a finding of probable cause are as follows:

***SEE ATTACHED AFFIDAVIT***

Continued on the attached sheet and made a part thereof.
I specifically request that the judge review this warrant for vagueness and over breath

FILED
MAY 15 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY [signature] DEPUTY

[signature]
Ronald T. Ribail
Special Agent, FBI

Sworn to before me, and subscribed in my presence
May 15, 2008, at San Diego, California;
@ 4:35 pm
PETER C. LEWIS U.S. Magistrate Judge, [signature]
Signature of Judicial Officer

# ATTACHMENT A

## ITEMS TO BE SEIZED

The items to be seized are evidence of violations of Title 18, United States Code, Section 842(a)(2) and (i)(1)and 1028(a)(7), specifically:

A. Any and all computer software and hardware including, but not limited to, hard drives, diskettes, zip diskettes, compact diskettes, Secure Digital cards, Compact Flash cards, Memory Sticks, Micro Secure Digital cards, DVDs, and any other flash memory devices.

B. Any and all bomb making components and/or bomb making paraphernalia including, but not limited to, the following:

1. Black powder, smokeless powder, and/or other incendiary/explosive materials, along with containers for these materials (specifically, but, not limited to, the Hodgdon brand).

2. Gasoline, other flammable liquids, and containers for such liquids.

3. Threaded metal pipe, metal end caps or "nipples".

4. Fuses, (specifically, but, not limited to, green "hobby type" fuses).

5. Nails.

6. Adhesive material including, but not limited to, duct tape.

7. White fabric or cloth

C. Any and all bomb building items including, but not limited to, bench type vises, pliers, scissors or other cutting tools, drills, drill bits, brooms, vacuum(s), garbage can(s), instructions and/or manuals which illustrate the building of explosive devices.

D. Any and all receipts evidencing the purchase of bomb making components, bomb making paraphernalia, and/or bomb building items, as stated above.

E. Any and all sketches, maps, building diagrams, photographs of potential target locations.

F. Any and all handwritten notes indicating an intention to build, construct, place, detonate, sell, or trade a bomb, explosives, or explosive device.

G. Any and all trace evidence including, but not limited to, incendiary/explosive material, metal shavings, cloth, hairs and fibers and/or adhesive material.

H. Any and all clothing resembling the following: dark or brown pants, dark jacket or dark hooded jacket, hooded sweat shirt, dark hat, dark knit cap, or dark beanie, white or light colored shoes, white or light colored gloves to include latex style gloves.

I. Any and all souvenirs of the crimes including, but not limited to, newspaper clippings, video recordings, and/or other mediums of media coverage, and/or photographs relating to the bombing of either the courthouse or the Federal Express Office.

J. Oral and/or Buccal swabs and head hair samples for the purposes of conducting Deoxyribonucleic Analysis hereinafter "DNA").

K. Any and all cellular telephones, personal assistance devices (hereinafter "PDA"), Global Positioning Satellite (hereinafter "GPS") devices, cameras, camera film answering machines, and/or scanners/facsimile machines.

L. Any and all documents and records relating to ownership, management and control of the above described locations including, but not limited to, rental agreements, rental payment documents, mortgage records and/or utility bills.

M. Any and all documents and records relating to ownership, management and control of cellular telephone(s) owned by RACHELLE LYNETTE CARLOCK and related telephone bills.

N. Any and all weapons and/or illicit narcotics.

O. Any and all documents referring to S__ M__ G____r or relating to fraudulent identification documents.

## ATTACHMENT B

I believe I have probable cause to search the premises located at 3868 Teak Street, San Diego, California 92113, including all outbuildings, garages, sheds, and non-operational vehicles at the rear of the curtilage.

3868 Teak Street, San Diego, California 92113 is further described as follows:

It is a one story, tan, stucco home with brown trim that is located on a hill. It has concrete stairs with black hand rails leading from the street up to the front porch. The roof is covered with brown asphalt composite shingles. An archway, which is part of the porch, faces Teak Street. When looking at the residence, the numbers "3868" are affixed to the left of the archway. An alleyway abuts the rear of the residence and provides access to a two car garage, which is also located in the rear of the residence.

**AFFIDAVIT**

I, Ronald T. Ribail, being duly sworn, depose and state:

I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been so employed for the past five years. I am currently assigned to the Imperial County Resident Agency of the San Diego Field Office, where my primary investigative responsibilities are to conduct counter-terrorism investigations.

In addition to the experience gained over the past five years, I received extensive training in the conducting complex investigation and the preparation and execution of search warrants, while at the FBI Academy in Quantico, Virginia.

**VIOLATIONS BEING INVESTIGATED**

Your affiant is investigating violations of Title 18, United States Code, Section 842(a)(2) and (i)(1), Use of False Identification to Obtain Explosive Materials and Felon in Possession of Explosive Materials, and Title 18, United States Code, Section 1028(a)(7), Fraud in connection with identification documents Relating to the Bombing of Government Property.

In preparing this affidavit, I have relied upon information made available to me by other law enforcement officers, agencies, and telecommunications systems.

Because this affidavit is being submitted for the limited

purpose of obtaining search warrants for the locations identified herein, I have not set forth each and every detail obtained over the course of this investigation. I have only set forth those facts and circumstances that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the aforementioned violations are presently located at the premises identified herein.

**PREMISES TO BE SEARCHED**

Based on the facts and circumstances laid out below, I believe probable cause exists which justifies the search of the residence located at 2952 40th Street, San Diego, California 92105. The residence is further described as follows:

It is a single story, white home located on the back half of a property located on 40th Street. The home's primary entrance appears to be accessed through from the alley way located between 39th and 40th Streets. There are the numbers "2952" displayed on the western side of the residence near its northwest corner. The house is the furthest south house on the east side of the alley way prior to the alley way ending in a drop into a canyon or wash. The residence has a satellite television dish located on the southern edge of the roof.

I also believe probable cause exists which justifies the search of the residence located at 3868 Teak Street, San Diego,

California 92113. The residence is further described as follows:

It is a one story, tan, stucco home with brown trim that is located on a hill. It has concrete stairs with black hand rails leading from the street up to the front porch. The roof is covered with brown asphalt composite shingles. An archway, which is part of the porch, faces Teak Street. When looking at the residence, the numbers "3868" are affixed to the left of the archway. An alleyway abuts the rear of the residence and provides access to a two car garage, which is also located in the rear of the residence.

**BACKGROUND ON THE RECENT BOMBINGS IN SAN DIEGO**

On April 25, 2008, at approximately 1:30 a.m., an explosive device detonated at the Federal Express Distribution Center in San Diego, California. Local law enforcement responded to and investigated this incident. The Metro Arson Task Force (MAST) was given responsibility to complete the investigation and therefore took custody of the evidence collected. No suspects were identified by the initial investigation.

On May 4, 2008, at approximately 1:41 a.m., a bomb was detonated adjacent to the eastern entrance (front doors)of the Edward J. Schwartz Federal Courthouse (hereinafter "courthouse"), located at 940 Front Street, San Diego, California.

**INITIAL FBI INVESTIGATION**

Representatives of multiple state and federal public safety agencies, including the Federal Bureau of Investigation (FBI), responded to the courthouse. During the response, surveillance video that captured images of the bomber was located. A review of this surveillance video revealed that an unknown individual approached the front of the courthouse and placed a black bag up against a glass pane. The individual stooped over and ignited the black bag. The bag was immediately engulfed in flames, suggesting that it had been saturated with a volatile and flammable substance. It continued burning, with flames reaching multiple feet in height, and shortly thereafter detonated. The subject appeared to have dark hair hanging past the shoulders, a dark knit cap over the crown of the head, a dark parka style jacket, brown or reddish hued pants, white shoes, and white or light colored gloves. The person began sprinting away from the device as soon as it was engulfed in flames.

Surveillance footage from another camera in the area showed the bombing suspect sprinting away from the vicinity of the burning bag southbound, through trees and grass, and towards the bridgeway over Front Street. The device detonated after the suspect was approximately 100 meters from the front of the building. Another surveillance camera, located further south on

Front Street, identified someone running south along Front Street at a time consistent with the flight of the subject. This video appeared to depict an individual with a dark jacket, dark pants, and a knit cap. It also appeared to show the individual wearing white or light colored shoes and gloves.

**EYEWITNESS TO THE BOMBING**

During the late morning of May 4, 2008, Michael Hamann identified himself to the FBI as a witness. Hamann stated that he was with three friends walking north on Front Street around the time of the bombing. Hamann was physically located underneath the bridgeway formed by the 880 Front Street building. From this location, Hamann observed the flash of the explosive device's detonation in the vicinity of the eastern entrance of the courthouse. Hamann also recalled that at the time of the detonation he saw someone running south on the west side of Front Street, under the bridge-way, toward him. Hamann described this person as wearing a hooded sweatshirt (hood worn down), wearing dark pants, and having long, dark, and curly hair. Hamann described the hair as being shoulder length while at the same time gesturing with his hand to the middle of his tricep. The affiant interpreted Hamann's gesture as meaning the length of hair extended beyond shoulder length. Hamann also described the hair as distinctive, as if it were dirty.

**EVIDENCE RECOVERED AT THE COURTHOUSE**

The FBI's Evidence Response Team (ERT) collected physical evidence of the bombing. ERT collected multiple pieces of debris believed to have originated from the explosive device. Several pieces of metal debris were enmeshed in tattered pieces of white fabric, which appeared to have been part of the device prior to its detonation. A piece of pipe fragment located in front of the courthouse had an adhesive label which identified the product's stock-keeping unit (SKU) number. The evidence was sent to the FBI's Laboratory in Quantico, Virginia. It has been determined that the pipe was previously purchased at a Home Depot.

**INVESTIGATION OF CONNECTIONS BETWEEN TWO BOMBINGS**

Investigators on the morning of May 4, 2008, considered whether or not the earlier bombing on April 25, 2008, at the Federal Express Distribution Center in San Diego, California was related to the federal courthouse bombing. Accordingly, the physical evidence from that bombing was taken into FBI custody and sent to the FBI Laboratory for comparative analysis.

The local investigators who investigated the Federal Express device explained that it consisted of two pipe bombs. One of them detonated first, apparently extinguishing the ignition device on the other pipe bomb, leaving it unexploded in the nearby parking lot where it came to rest.

**PRELIMINARY LABORATORY ANALYSIS**

The FBI laboratory reported that the unexploded pipe bomb recovered at the Federal Express Distribution Center contained powder that was preliminarily determined to be consistent with *Hodgdon's TRIPLE SE7EN* (trademarked spelling) brand powder in the FFG granular size. This powder appears to be an improvement on and a derivative of an earlier *Hodgdon* product called *Pyrodex*. Both are considered to be black powder substitutes. The analysis of the bulk powder from this device also indicated that gasoline was present.

The FBI laboratory reported that residue from the pipe bomb that did explode at the Federal Express Distribution Center was preliminarily consistent with *Pyrodex* or black powder.

The FBI laboratory reported that the dimensions of the two pipes used in the Federal Express Distribution Center bombing were identical. They were of one inch nominal diameter and eight inches in length. The pipe bomb that detonated had a product identification sticker on it. The sticker provided the following information regarding the pipe - "1" x 8" GALV STEEL PIPE NIPPLE."

The FBI laboratory reported that the device used at the federal courthouse consisted of three separate pipe bombs. One consisted of a two inch nominal diameter pipe nipple that was ten inches in length while the other two were one and a half

inch nominal diameter pipe nipples that were ten inches in length. All three were made of galvanized steel. Preliminary examination of residue from fragments of these pipes indicated it was consistent with *Pyrodex* or black powder. Additionally, gasoline was identified on fragments of the black cloth material that came from the back pack destroyed during the fire and bomb detonation.

Debris from both bombings indicated that nails were incorporated into their design. The types of nails used in the two bombings appeared to be consistent with one another. The author is aware that additional metal components, such as nails, are usually added to bombs in order provide an enhanced anti-personnel effect upon detonation.

**ATTEMPTED PURCHASE OF POWDER AT EL CAJON GUN EXCHANGE**

On May 13, 2008, information was received indicating that a suspicious person was attempting to purchase various granular sizes of *Hodgdon's TRIPLE SE7EN* powder at the El Cajon Gun Exchange, 427 Broadway, El Cajon, California. Further investigation indicated the following: An African American female with curly hair extending down past her shoulders approached an employee of El Cajon Gun Exchange (a Federal Firearms Licensee) about a powder purchase. The employee identified two bottles of black powder which the female was interested in and set them on the counter for her to inspect.

The employee obtained the female's identification card (a California driver's license) which is part of the record keeping process for making a powder purchase. The employee was going transcribe the information from the driver's license onto an information sheet, but another employee verbally reminded him of the new store policy, which is to obtain a photocopy of the identification card. The female acted surprised by this new procedure and departed the store.

The female walked back into the store after approximately five minutes and informed the employee that she no longer desired to conduct the powder purchase. Furthermore, she wanted the photocopy of her identification card back from the store. The employee responded that he would give her the photocopy back, but had to first ask his supervisor if it was permissible. The employee went into a back room and made a second copy of the original photocopy, then returned to the female at the counter, providing her with one of the two copies. The female then departed the store.

The two bottles presented to the female for inspection were handled by her. When investigators arrived at the El Cajon Gun Exchange, the store employees provided the original two bottles. These bottles were taken into custody for potential latent fingerprint analysis. One of the bottles was labeled as *Hodgdon TRIPLE SE7EN* in FFG granular size. (This is consistent with

preliminary laboratory reporting regarding the Federal Express Distribution Center bomb that did not detonate.)

The identification card presented by the female had a photograph on it which store employees and video surveillance indicated matched her actual appearance. The California driver's license (CDL) number on the identification card, when queried with California Department of Motor Vehicles, resulted in a record that contained a picture of a completely different person (different race, height, and weight). The name on this identification card was S__ M__ G_____r. (I have intentionally excluded the complete name on the CDL to protect the identity of that individual, who appears to have no relation to these events but instead appears to be the innocent victim of an identity theft.)

San Diego Police Department records indicated that in 2007 an individual named S__ M__ G_____r was a crime victim. The report indicated that the crime involved False Personation. Local law enforcement indicated that this charge was a type of identity theft. Further investigation indicated that the crime involved was the attempted or actual cashing of checks in the name of S__ M__ G_____r by another unknown person.

El Cajon Gun Exchange records were reviewed for earlier purchases of powder by anyone identifying themselves as S__ M__ G_____r. They indicated that on April 7, 2008, someone

identified as S__ M__ G_____r made a purchase of two pounds of *Hodgdon TRIPLE SE7EN* powder. Additionally, on May 1, 2008, someone identified as S__ M__ G_____er bought an additional two pounds of *Hodgdon TRIPLE SE7EN* powder. The dates of these two purchases precede the Federal Express Distribution Center bombing and the federal courthouse bombing, respectively.

Another store named Discount Gun Mart reported that approximately two weeks prior to May 13, 2008, a black female had entered the store. The black female was remarkable because she asked questions about the differences between several powders. The typical customer who purchases powder comes with complete foreknowledge of the product they need to purchase and rarely, if ever, asks such questions.

**INFORMATION PROVIDED BY COOPERATING WITNESS**

On May 12, 2008, at approximately 4:15 p.m., an attorney called the FBI indicating that he desired to arrange a meeting between the FBI and his/her client. A meeting took place in the evening of May 13, 2008. The individual, hereafter referred to as a cooperating witness, is currently under investigation, and being prosecuted by California authorities for perjury, forgery, burglary, and possession of illegal firearms. In addition, he has numerous arrests, and felony convictions to include possession of stolen property, possession of controlled substances for sale, and possession of controlled substances.

While no promises have been made by the FBI or federal authorities to the cooperating witness, the witness has been advised that he may receive monetary compensation if his information is reliable and results in the conviction of the federal courthouse bomber. In addition, the cooperating witness was advised that federal authorities could not make any promises regarding his state cases and could only relay the fact of his cooperation to state authorities.

The cooperating witness provided the identity of a black female, Rachelle Lynette Carlock, which he/she knew was making pipe bombs. The cooperating witness stated that in the late morning of May 4, 2008, after the courthouse bombing, Carlock was scanning through television channels and seemed excited by the fact that national news was covering the San Diego court house bombing. The cooperating witness felt that this behavior was out of character for Carlock and indicated to him/her that she was either responsible for or involved in the bombing.

The cooperating witness continued, stating that he/she had previously observed Carlock assemble pipe bombs. The cooperating witness described one of these bombs as being a one inch by eight inch galvanized steel pipe nipple with two end caps. The end cap had a hole drilled in the end and was filled with a dark granular substance. A green looking string was used as an igniter. A white cloth of unknown purpose was also part

of the bomb's construction.

The FBI Laboratory photographed all the bomb evidence submitted in these two bombings and provided preliminary inventories. These photographs and inventories identified the following debris recovered from the two bombing incidents that potentially corroborate the cooperating witness's observations: a one inch by eight inch galvanized steel pipe nipple with two end caps (intact); a strand of green fuse; pieces of white cloth; an end cap with a hole drilled in it. This information was never release to the media or the public.

The cooperating witness also recalled that on the morning of May 4, 2008, Carlock was wearing a brown track suit or sweatsuit. Furthermore, the cooperating witness indicated that Carlock always wore hair extensions that extended down past her shoulder. This information was consistent with images captured of the subject in the courthouse bombing and this description was never released to the media or the public.

**SOURCE CORROBORATION**

Carlock's true California driver's license record was located. The photograph associated with that CDL appeared to depict the same person that entered the El Cajon Gun Exchange on May 13, 2008. Furthermore, the real CDL photograph matched the photograph on the identification card presented during that transaction that was in the name of S__ M__ G_____r.

A review of California law enforcement records indicate that Carlock had a tattoo on her right inside forearm that depicted the name "TONY" in script. An employee at the El Cajon Gun Exchange who saw the suspicious black female on May 13, 2008, indicated that they saw a tattoo on her arm that spelled "TONY."

In addition, a review of California DMV records as of January 30, 2007, reveals that Carlock's residence is 2956 40th Street, San Diego, California 92105,[1] and lists a secondary address as 3868 Teak Street, San Diego, California 92113.

**LOCATIONS REASONABLY BELIEVED TO CONTAIN EVIDENCE**

The cooperating witness indicated that he/she observed Carlock assemble one pipe bomb at 3868 Teak Street, San Diego, California. The cooperating witness described this as the location at which Carlock stores her personal effects and which she refers to as her home. The cooperating witness believes the date of this observation was some time in November 2007. In addition, the cooperating witness also provided Carlock's cellular phone number.

The cooperating witness further indicated that he/she observed Carlock assemble another pipe bomb on December 30, 2007. This bomb was assembled in the house of "Don Juan," who

---

[1] Although 2956 40th Street is listed as her DMV address, the cooperating witness indicates that Carlock does not actually reside there, nor does she store her personal affects there.

is a friend of Carlock's. Don Juan's residence is 2952 40th Street, San Diego, California 92105. Carlock was also at this location on the morning of May 4, 2008, according to the cooperating witness (this is the location where she was observed remarking about the national media coverage for the bombing.)

**CARLOCK'S PRIOR FELONY CONVICTION**

ATF Special Agent Galvan has informed me that San Diego County District Attorney Investigator Ken Freshwater told him that on November 11, 1999, in the San Diego Superior Court, Rachelle Lynette Carlock was convicted of California Penal Code Section 211, and sentenced to two years in state prison. Upon completing her prison term she was paroled to a half-way house in San Diego, and ultimately completed her parole in 2006.

**PERSISTENCY OF EVIDENCE IN THESE LOCATIONS**

According to the observations of the cooperating witness in this case, at least one hole was drilled in a metal pipe used by Carlock. This hole would have been drilled in order to provide a pathway to ignite the explosives contained within. The process of drilling a hole in metal creates small shavings which are easily overlooked and often left in the location of the drilling. Also, powders like *Hodgdon TRIPLE SE7EN* with FFG sized granules are easily spilled and very likely could be left behind as residue in the location where a bomb was assembled. Therefore, your affiant believes that this type of evidence, as

well as other trace evidence, is likely still located in the residences where assembly took place.

**OTHER EVIDENCE LIKELY TO BE FOUND**

Additionally, the cooperating witness indicated that Carlock sold pipe bombs for money. Since this was a business enterprise for her, it is very likely that she kept records of customers and the amounts they paid or owed.

Carlock's use of a fraudulent, but very life-like California driver's license, also suggests she may have used electronic equipment such as a computer and printer to produce them. Additionally, the fraudulent use of the identity of S__ M__ G_____r in the process of illegally purchasing powder indicates that there may also be documents and records in the vicinity of the bomb making locations that refer to Gueldner's personal identifiers.

**SEARCHES OF COMPUTERS AND OTHER DIGITAL EQUIPMENT**

Based upon information related to me by other law enforcement agent, I know that digital evidence can be stored on a variety of systems and magnetic, optical and mechanical storage devices including, but not limited to, hard disk drives, floppy disks, CD-ROMs, DVD-ROMs, magnetic tapes, magneto optical cartridges, personal digital assistants, pagers and memory chips.

Computer forensic agents (CFA) will be available during the

execution of this search warrant to ensure that any computer systems are properly shut down and packaged for transport. FBI personnel will also instruct me on the proper manner in which to safely transport any seized digital media to a secure Evidence Storage Facility.

Any computers or computer systems, as defined in Attachment "B", found at the locations to be searched. Rather, with the assistance of the computer forensic agents, any computers or computer systems found will be seized, transported from the scene, imaged at the Regional Computer Forensic Laboratory (RCFL), and examined. This procedure is justified for two reasons. First, as set forth above, there is sufficient probable cause to show the Court that the computers and computer systems contain contraband, constitute evidence of the commission of a criminal offense, and/or were used as the means of committing a criminal offense.

Second, searching computers and computer systems is a highly technical process that requires specific expertise, equipment and software. There are a multitude of different types of computers manufactured today, many of which use proprietary hardware and software during the creation of any user data. It is impracticable for the law enforcement community to have all the proper adapters, cables, cords and other hardware devices necessary to consistently link law

enforcement forensic equipment with all known and unknown computer systems on an immediate basis while searching "on-site." Much of this specialized equipment is available, but may need to be acquired in order to conduct a proper forensic examination.

There are literally thousands of different software programs that can be commercially purchased and installed on a user's computer system. As computer security has become an ever-increasing priority to many consumers, much of today's commercially available software is developed for, or provides, data security and encryption which makes it difficult to afford an accurate representation of any digital evidence confronted with on-site. Moreover, it is not feasible for a Computer Forensic Examiner to be familiar with every software program, past or present, now commercially available. It may be necessary for a CFA to train with a particular type of software in order to fully understand the capabilities of that software.

In order to safeguard the integrity of a computer forensic examination, it is imperative that the CFA first make a complete image of the original digital evidence before conducting a forensic examination. The CFA must ensure that any images made are forensically sound and that these forensic images can be fully restored, if necessary. There are numerous pitfalls that can seriously hamper the integrity of the imaging process while

on-site. For example, to make a forensically sound image of targeted original digital evidence, the CFA must ensure that there is an adequate uninterruptible power supply. Digital evidence is extremely fragile and susceptible to power interruptions or power surges. It is not always practical for a CFA to bring backup power supplies into the field.

Additionally, it may be necessary for the CFA to have unrestricted access to the original digital evidence during the course and scope of the forensic examination. There are numerous operating systems now being used by consumers. Some of these operating systems include, but are not limited to, DOS, Windows 3x, Windows 9x, Windows NT, Windows 2000, Macintosh, Linux, Unix, Novell and PICK. These operating systems use different file structures, different partition formatting and different file commands. Moreover, many of these operating systems are "hardware" specific. This means that a restored image of original digital evidence may not be "bootable" or "viewable" without the actual original hardware. This would prevent the CFA from viewing the restored digital image in a manner consistent with the structure of the original digital evidence. This problem is especially acute when dealing with operating systems like Linux, Unix, MAC and Novell.

These problems are accentuated by the fact that it is possible for a user to have two or more different operating

systems on the same piece of original digital evidence. This severely hampers the CFA's ability to image this type of original digital evidence on-site due to certain software limitations. This type of problem generally requires that the imaging process take place in a controlled environment, such as the RCFL. Once this procedure is completed, a CFA can then safely conduct most types of requested examination using this newly created "image" file without fear of damaging, destroying, adding or altering any files or operating system components of the original digital evidence.

It is also very difficult in today's computer environment to "search" for specific data while on-site. To conduct any type of digital "search" without using a forensically created image predisposes multiple forensic problems. It may literally take hours, if not days, to appropriately search a medium to large size hard drive for any desired data. For example, a search for the word "kill" during a homicide investigation could find thousands of positive hits, due to the fact that while a subject may have in fact wanted to kill the victim. The term "kill", however, is also a valid computer command related to the ending of an otherwise innocuous computer process.

Computers can be difficult to examine even if no serious effort is used to conceal or protect its digital contents. A complete forensic search is not limited to examining files

normally displayed by the operating system. It also includes the expansion of compressed data and the recovery of deleted file data. It involves the areas on a computer hard drive that the computer system recognizes as being "in use" and those areas that the computer that the computer system deems "available for use." This search may involve an examination of "slack" space, which is the information at the end of a sector or cluster beyond the end of the "current" usage. Finally, the complete examination would address "orphaned" data, portions of files left behind by earlier operating system activity. All of these areas require operating specific tools and techniques to access the data.

It is also very easy for a computer user to conceal data or other types of digital evidence through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension "jpg" are digital image files. A moderately sophisticated computer user, however, can easily change the .jpg file extension to "txt" or "dll" in order to conceal or mislead law enforcement into thinking the digital image is actually a text or system file. While it is may be possible for a CFA to notice this during a properly controlled forensic examination, it is difficult for that same CFA to do detect this concealment during an on-site examination. For example, the Windows 9x Operating System,

installed right out of the box, would itself contain over 20,000 different system files. A devious user could then alter any improper files so as to make them appear to be legitimate files.

The problems noted above are compounded by the fact that the volume of data stored on a typical computer system is so large that it would be unrealistic to search for specific data while conducting an on-site examination. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now capable of storing more than 60 gigabytes of data and are commonplace in new desktop computers.

Additional problems are created by the growing use of destructive programs or "booby traps." These programs can destroy or alter data if certain forensic procedures are not scrupulously followed. Since digital evidence is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as the RCFL, is essential to conducting a complete and accurate examination of any digital evidence. This problem mandates that all examinations need to take place using only a forensic image of the original digital evidence.

Finally, there is also a growing use of military-grade

encryption by consumer and commercial computer users. These encryption programs, which are low or no cost, are widely available and allow users to encrypt specific data with just a few keystrokes. These encryption problems are accentuated by other newer technologies, like steganography, which allows a user to conceal information within other files. It is difficult to detect the use of this technology without a proper forensic examination and the ability to look at the entire image of the subject digital evidence.

For the reasons set forth above, I respectfully request that I be allowed to seize all computers and computer systems, as defined in Attachment "B," and transport them to the RCFL for a proper forensic examination including imaging and searching.

The term "computer" as used herein is defined as set forth in 18 U.S.C. § 1030(e)(1), and includes any electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

Based on training and through my personal use of computers, I have knowledge of the method by which e-mail and other files are transmitted over telephone lines or cable between computers. Based on my training and knowledge I know the following:

a. With the modem, a computer user can transport a computer file to his own computer, so that the computer file is stored in his computer. The process of transporting a file to one's own computer from another is called "downloading."

b. The user can then view the file on his/her computer screen (monitor), and can "save" or retain the file on his/her computer for an indefinite time period.

c. In addition to permanently storing the file on the computer, the user may print the file.

d. The original file that is downloaded is also maintained in the originating computer.

e. With the modem, a computer user can send a file from the computer to another individual on the Internet. This process of sending a file is called "uploading."

f. The process of "uploading" is similar to the "downloading" process except the user is sending the computer file to others instead of retrieving the information from another computer. As with the process of "downloading," the original file is maintained on the originating computer.

g. A user can also use an e-mail program to send files to another individual on the Internet. Most e-mail programs allow the user to attach files to the e-mail. The attached files may be documents or images. Again, the original file is maintained on the originating computer.

**TELEPHONE UTILIZED BY CARLOCK**

The cooperating witness was also able to determine that the cellular telephone utilized by Carlock is (619) 218-0791. On May 14, 2008, at approximately 1:59 p.m., law enforcement officers observed the cooperating witness place a call to Carlock at this telephone number.

**UNDERCOVER MEETING WITH CARLOCK**

On May 15, 2008, the cooperating witness met with Carlock. Agents recorded and surveilled this meeting. During that meeting, the cooperating witness asked Carlock whether she made the pipe bomb used in the federal courthouse bombing. Carlock denied that she made the bomb; however, she indicated that she knew the maker of the bomb and could acquire a pipe bomb from him. Shortly after this conversation, surveillance agents observed Carlock go directly to a Home Depot in San Diego County. While at the Home Depot, surveillance agents observed Carlock looking at pipes and end caps.

**ADDITIONAL INTELLIGENCE**

On May 14, 2008, the FBI received information regarding the federal courthouse bombing, through officials at the Riverside County Jail. Those officials reported that they recently interviewed a female inmate, who is in custody at the Riverside County Jail facing charges related to petty theft with a prior and burglary. The female inmate related that she is a relative of the aforementioned cooperating witness. She also claimed that she had firsthand knowledge of the events surrounding the courthouse bombing and was the ultimate source of any information provided by the cooperating witness to law enforcement authorities. She claimed that sometime prior to the federal courthouse bombing, she personally observed an black

male (who she did not identify) construct a pipe bomb. She opined that this individual was the actual bomber because she was with him prior to the bombing at a joint location, and he was absent from that location when the courthouse bombing occurred. She also based her opinion on a conversation that she had with this individual, where other unidentified persons were present, in which he claimed he knew how to construct pipe bombs. She provided a vague description of the pipe bomb, i.e., a steel pipe purchased from Home Depot, approximately 8" in length and 1" screw-on end caps. While the identity of the bomber as a black male (as opposed to a black female) contradicts information provided by the cooperating witness, investigators have not yet been able to test the reliability of her information or corroborate her account of events. On the other hand, as noted above, the information provided by the cooperating witness as to the description of the bomb and the identity of Carlock as being involved in the courthouse bombing has been corroborated by independent investigation. Your affiant opines that the female inmate, who is a relative of the cooperating witness, has obviously learned that the cooperating witness is providing information to the FBI and other law enforcement authorities and she may be claiming firsthand knowledge of the events in order to curry favor with law enforcement because of her pending state charges. As noted

above, the information she provided to date is vaguer than that provided by the cooperating witness. Moreover, your affiant has learned that the female inmate's name was searched against the records of purchases of powder in San Diego County and she was determined to have made a purchase of powder on March 26, 2008. Your affiant is also concerned that the female inmate may now be providing information because she is concerned about her own criminal liability in the construction of pipe bombs with Carlock or other individuals.

**CONCLUSION**

Based on the aforementioned information, the author believes that probable cause exists to search the two identified locations.

Your affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment A.

Ronald T. Ribail
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me
this 15th day of May, 2008

PETER C. LEWIS
United States Magistrate Judge